UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| JOHN RUCH, | ) | |
| | ) | |
|     Plaintiff, | ) | |
| | ) | CASE NO: |
|     v. | ) | |
| | ) | |
| CITY OF ATLANTA, | ) | |
| SERGEANT MICHELLE MCKENZIE, | ) | |
| SERGEANT ALAN GRUEN, | ) | |
| OFFICER BROWN, and | ) | |
| DEPUTY CHIEF RODNEY BRYANT, | ) | |
| DEPUTY CHIEF JOSEPH SPILLANE, | ) | |
| OFFICER JOHN DOE, | ) | |
| each individually, | ) | |
| | ) | |
|     Defendants. | ) | |

## **COMPLAINT**

COMES NOW Plaintiff John Ruch and brings this action against Defendants

for violations of the First, Fourth and Fourteenth Amendments of the United States

Constitution, 41 U.S.C. § 2000aa and Georgia law after he was arrested while

working as a reporter photographing police activity in a non-disruptive way from a

distance on a public sidewalk.

1

Case 1:15-cv-03296-MHC Document 1-2 Filed 09/21/15 Page 2 of 20

## PARTIES

1.      Plaintiff John Ruch ("Plaintiff") is a United States citizen and resident of Georgia and over the age of eighteen.  He is currently Associate Editor at Spring Publishing in Sandy Springs, Georgia.  At the time of this incident, Ruch served as a reporter for *Creative Loafing*, an Atlanta-based newspaper.

2.      Defendants Sergeant Michelle McKenzie  ("McKenzie"), Sergeant Alan Gruen ("Gruen"), Officer Brown (identity to be determined and Complaint amended), Officer John Doe (identity to be determined and Complaint amended) (collectively "Officers") are all employed as police officers by the City of Atlanta. They are sued in their individual capacities.  At all times relevant to the complaint, each acted under the color of law.

3.      Defendant City of Atlanta is a municipal corporation created under the laws of the State of Georgia. At all times relevant to this complaint, the City of Atlanta employed the Officers as police officers with the Atlanta Police Department ("APD").

## JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction under 28 U.S.C. § 1331

because this case presents a federal question under 42 U.S.C. § 1983

and the First, Fourth and Fourteenth Amendments of the United States

Constitution.

5.      This Court has supplemental jurisdiction over Plaintiff's state law

claims under 28 U.S.C. § 1367.

6.      Upon service of process, this Court acquires personal jurisdiction of

the Defendants under Fed.R.Civ.P. 4(k)(1)(a).

7.      Venue is proper in the Northern District of Georgia under 28 U.S.C. §

1391(b) because all actions complained of occurred within the

boundaries of this district and Defendants reside within this district.

## STATEMENT OF FACTS

8.      John Ruch is a frequently published freelance journalist.

9.      On November 25, 2014, around 8 p.m., he went to downtown Atlanta

to investigate a potential news story: the Ferguson protest taking place

in downtown Atlanta was turning into a large march, making it a

significant part of an historic national event.

10.     Ruch was assigned by *Creative Loafing* News Editor Thomas

3

Wheatley to cover the protest along with his on-scene reporter, Max Blau.  Wheatley assigned Ruch to cover the tail-end of the march, while he took the front end and Max Blau covered the middle of the group.

11.    Ruch's work would involve tweeting on *Creative Loafing*'s live blog and contributing whatever stories or photographs he had for future stories in the *Creative Loafing*.

12.    Around 11:45 p.m., the march turned onto Spring Street and began to coalesce around a specific group of protesters. Ruch heard a commotion involving civilians and officers in front of the America's Mart entrance and Zone 5 police station area, near the Andrew Young Boulevard intersection.

13.    Recognizing that a newsworthy matter was transpiring, Ruch approached the scene to photograph and report on whatever was occurring.

14.    When he reached the main body of protesters on the Spring Street sidewalk, they had formed a kind of circle around something and were chanting. Through gaps in the human wall, he could see police

4

wrestling one or two people to the ground and arresting them.

15.     From his vantage point on the sidewalk some distance away, Ruch had a clear view of police officers wrestling a person to the ground and arresting them. The people being arrested were screaming and the police officers were very forcefully slamming them to the ground. While Ruch did not know the reason for the arrest, he knew it would be a powerful image in any case and had an outstanding view. The sidewalk is quite wide there, and Ruch was about six feet away from the arrest and remained there on the sidewalk.

16.     Ruch lifted his phone to take a news photo, keeping distance and placement on the sidewalk while attempting to frame the shot. His head was down and focused on his camera phone, which he held around stomach height to photograph the action on the ground.

17.     Without warning, someone waved a hand in front of his camera purposefully disrupting him. This person did not say anything, and only attempted to block Ruch's shot.

18.     At no time during the entire incident that led to his arrest did Ruch interfere with any arrests or any other police activity in any way and

he was not given and did not disobey any instructions from any officers. On information and belief, other reporters were in the precise area where Ruch was arrested and they too received no instructions from police directed at the media or the protesters generally.

19.     Remaining on the sidewalk and away from the arrest, Ruch shifted his body slightly in order to get the shot while the gap between other people was still clear. The hand-waving person then leaped in front of Ruch.

20.     The person then grabbed Ruch's camera and his wrist or forearm, preventing him from taking the shot.

21.     Ruch then looked at the person fully and saw she was a police officer, who he later came to learn is named Defendant Sergeant Michelle McKenzie. Officer McKenzie continued to say nothing as she grabbed Ruch. She then pushed Ruch, forcing him to take a step back.

22.     Ruch immediately said, "Hey, I'm a reporter! I'm with the media! I'm with the media!" Officer McKenzie still said nothing but paused for a half-second. Ruch then felt someone grab and tug on his jacket from

6

behind.

23.      Defendant "John Doe", a yet-to-be unidentified male supervising officer said, "Take this one." Officer McKenzie immediately ordered, "You're under arrest. Get on the ground." Another officer (later identified as Defendant Officer Brown) joined her in forcing Ruch face down on the sidewalk. Ruch complied peacefully. They both ordered Ruch to place his hands behind his head.

24.      As he lay on the ground, Ruch repeatedly said he was a reporter for *Creative Loafing* and repeatedly asked why he was being arrested and what he was being charged with. The officers said nothing and did not read him his rights.

25.      Without any arguable probable cause, the officers handcuffed Ruch and brought him to his feet. Another officer appeared and replaced handcuffs with plastic tie cuffs. The officers confiscated Ruch's cell phone and hat.

26.      As this was happening, Editor Wheatley walked nearby. Ruch shouted to him, "Thomas, they're arresting me!" Wheatley approached, identified himself as the *Creative Loafing* News Editor, and informed

7

the officers that he was a journalist working for *Creative Loafing*.

27.    The officers asked if Ruch had a "media badge." Wheatley explained to the officers that Ruch was not issued a media badge and noted that he himself did not have any such badge. The officers said nothing, merely standing there holding Ruch's arms. Thomas Wheatley and Ruch repeatedly asked the officers why they were arresting Ruch and under what charges. The officers remained silent.

28.    After a couple of minutes, Ruch was handed off to another officer and made to stand in the street behind a police car.

29.    Wheatley continued to ask about the charges, again meeting only silence from the officers.

30.    After some time, two or three officers escorted Ruch up the sidewalk on Andrew Young Boulevard, where a police car and a prisoner transport bus were parked.

31.    As they walked toward the transport bus, Wheatley pointed Ruch out to Greg Bluestein, a reporter with the *Atlanta Journal-Constitution*. Ruch quickly told Bluestein his name and that he was being arrested for taking a news photo.

8

32.     As they walked up Andrew Young Boulevard, Wheatley followed

        alongside, repeatedly asking the officers what Ruch was charged with.

        One of them, (later identified as a "Lt. K. Tiernan"), repeatedly said,

        "We can't tell you. That would violate his privacy." Ruch stated he

        waived any privacy rights and that Ruch too did not know the charge.

        Lt. Tiernan did not say what the charges were. The other officers

        remained silent. Thomas Wheatley and Ruch also asked where Ruch

        was being taken, and the officers either refused to explain or admitted

        that they did not know.

33.     The police made Ruch stand in a group with the other arrestees, away

        from reporters.

34.     After some minutes, the officers made any witnesses leave that part of

        the sidewalk. One citizen holding some type of camera approached,

        and an officer remarked to another that he had been told to stay away

        and that he would be arrested if he approached closer and filmed.

35.     Eventually, an officer named Defendant Sergeant Alan Gruen

        approached Ruch and engaged him in a private conversation. Gruen

        had Ruch wait a moment while he spoke with a large white officer in

9

a white shirt, Ruch understands was a lieutenant or captain.

36.  Officer Gruen then returned. Ruch had been wearing a cowboy-style hat that was removed during his arrest. Officer Gruen, in a deliberate manner, placed it back on Ruch's head backward. Gruen or another officer also returned Ruch's phone, placing it in his shirt pocket, where Ruch could not access it while handcuffed.

37.  Officer Gruen asked if Ruch held a Georgia driver's license, and Ruch said yes. Gruen then asked, "Do you have a City of Atlanta license?" Officer Gruen attempted to intimidate Ruch, standing very close, face to face, and said something approximating, "Look, you must have done something to get arrested." Ruch replied, "I did not commit any crime," explained that he was a reporter who had been trying to take a news photo.

38.  Gruen became visibly angry and began speaking over Ruch. Gruen then said, "There must have been something that gave us probable cause. We can't un-arrest you, because that makes liability." Ruch repeated that he had not committed any crime.  Nevertheless, Gruen later charged Ruch, based on an order from an unidentified lieutenant.

10

39.     The police continued to leave Ruch standing in the street. They

discussed various options for what to do with Ruch and the other

protesters, ranging from jail transport to giving the group "tickets"

(official city complaint notices) and releasing them.

40.     The officers also could not locate Ruch's "arresting officer," Officer

McKenzie, repeatedly asking each other where she was and trying to

contact her on the radio.

41.     Eventually, yet another officer, a white male, approached Ruch with a

ticket form asking for his name, address and birthdate. Ruch asked

him why he was filling out this form, what he was being charged with,

and whether he would just be given a ticket or released. He said, "I

don't know."

42.     After more waiting, police officers ordered the group to get in the

prisoner transport bus. They were not told where they were being

taken despite queries from group members.

43.     The prisoner transport bus drove only a half-block, just across Spring

Street, and stopped in front of the Zone 5 police station. After a

lengthy wait, officers took the group inside the police station, into a

large room mostly occupied by police bicycle racks. Approximately
16 other arrestees were seated on plastic chairs. Twenty or more
police officers were in various locations around the room. The group
of arrestes remained in the room, seated and handcuffed, for at least
three hours. At no point did any officer read arrestees their rights, or
offer them food, water or phone calls -- nor were arrestees informed of
any charges against them.

44.     During this long wait, there was frequent conversation among and
between the arrestees and the police officers. It became clear that most
arrestees were not informed of the charges against them. Several
arrestees indicated officers had grabbed from behind for no reason. It
also became clear that the officers had no idea why most of the
arrestees were there or what to do with them. Some of the more
friendly officers openly admitted, "We don't know" when asked what
facility they would end up in, or why they were being imprisoned in
the bike room of a police station.

45.     The accounts from other arrestees strongly suggested that the police
were using arrests to deter others from protesting.   The police used

12

these bogus arrests to make a spectacle of the protesters they labeled "trouble-makers" and to hold them as long as possible. Like Ruch, several other arrestees said they had been grabbed from behind and arrested for no apparent reason, even while walking away from the scene. Several police officers stated that the police department had decided to end the protest, and none of them could explain what they were doing there.

46.     The officers searched each arrestee -- placing property into a bag (without a receipt), and then photographing each person.

47.     Ruch's confiscated property included his cell phone and reporter's notebook, which he specifically requested that officers close and not examine for First Amendment reasons.

48.     The officers wanted to photograph each arrestee with their arresting officer, but Sergeant McKenzie, still could not be found. During this process, Ruch got a first glimpse at the ticket he would be issued—he could see it had been fully filled out even though the arresting officer was not present. Ruch does not know who actually filled out the citation, though the handwriting appears similar to that of the white

13

male officer who originally entered his name and address on the form.
A civilian photographer took a photo of while an officer held some
kind of note on a piece of paper under his chin. Ruch asked them,
"What is this for? Is this a booking photo?" Both officers said, "I
don't know." Ruch asked the photographer if she was a police officer
and she said she is not.

49.     After several hours, Sergeant Gruen told Ruch to join him for another
        private chat. At this point, Gruen finally informed Ruch of the charge:
        disorderly conduct-obstruction. Ruch asked if that was two charges or
        one, and Gruen clarified it was only one. Officer Gruen then said, "It's
        a bullshit charge, but my lieutenant said we have to charge you. If it
        was up to me, I'd cut you loose."  Officer Gruen then added, "I'm an
        open-minded guy. I probably shouldn't even be a police officer." Ruch
        asked what would happen to him, and Gruen said that Ruch would be
        taken to the city jail and allowed to leave on a "signature bond."

50.     At approximately 3:30 a.m., four of the arrestees were released
        without charge. One of them was a black man wearing a Public
        Enemy T-shirt with the left back shoulder area ripped as if from being

grabbed. Another arrestee may have been released after police officers belatedly realized they had not processed him and none of them knew his name, the charges against him or even the arresting officer. Many of the other arrestees did not know the charges against them, and their arresting officers were not at the police station. One woman later said her ticket did not even identify any charges, complicating her booking.

51.    The remaining arrestees were taken back to the bus, where they waited for a long time. By this time, Ruch's wrists were aching and his right shoulder and upper arm cramped from having been cuffed for so long.

52.    Finally, the bus drove to the city jail. Upon arrival, correction officers informed arrestees that their bonds were posted by anonymous "good Samaritans" (later identified as the "Georgia Civil Disobedience Defense Fund"), and that they would be released after being booked. Arrestees were finally released from their handcuffs and seated en masse in the intake room lobby area. For the first time, Ruch and others had access to a water fountain and some food.

53.    The booking process took about two hours, including mug shot photos and fingerprinting. Ruch's booking was further delayed when he pointed out that they had mispelled his last name on the release form, and this error led to a second warrant check.

54.    Officers eventually release Ruch into the lobby area, where he met Wheatley and several members of the group that had bailed him out. They escorted Ruch to a nearby bail bond office to fill out final release paperwork.

55.    At the request of the city solicitor, Ruch's charges were dismissed at a 1 p.m. court hearing the next day.  (The ticket and disposition are attached hereto as Exhibit A and B).

56.    Ruch's wrists remained red from the cuffs for about 24 hours. The soreness in his arm persisted through November 27, 2014 and his shoulder continued to make popping noises until around December 2, 2014.

57.    As a result of Plaintiff's arrest, he suffered a loss of his liberty, reputational damage, humiliation, and physical and emotional distress.

16

### City of Atlanta's Policy and Practice and Contempt of Court in Failing to Adopt Court Required Policies and Training

58.     The City of Atlanta, as a matter of policy and practice, has routinely and customarily interfered with and often arrested citizens solely for constitutionally protected filming or photographing of police activity.

59.     On information and belief, and according to Defendant City of Atlanta's own employees, specifically delegated final policymakers for the City (Defendants Rodney Bryant and Joseph Spillane) gave instructions to officers on the date in question to arrest persons in the protest area who were filming protest activities and a specific instruction was given by a supervising officer, Defendant John Doe 1, to arrest Ruch.

60.     At least three prior legal matters have been settled by the City of Atlanta involving  officers who interfered with and arrested citizens solely for constitutionally protected filming or photographing of police activity.  Several other instances, not leading to litigation, have occurred where officers interfered with and arrested citizens solely for constitutionally protected filming or photographing of police activity.

61.     In *Anderson v. City of Atlanta,* No. 11-CV-3398-SCJ (N.D. Ga. 2011),

17

Plaintiff, Felicia Anderson, brought this case against the City of Atlanta and one of its police officers alleging, among other things, that she was falsely arrested for photographing police activity that occurred in public and that this arrest was conducted pursuant to an unlawful policy and practice of the Atlanta Police Department ("APD").

62.     The parties ultimately reached a settlement on Ms. Anderson's claims that included a Consent Order requiring the City to: (A) add specific language to the Atlanta Police Department's Standard Operating Procedure ("SOP") prohibiting officers from deleting or destroying recordings of police activity; (B) upgrade the penalty for officers who interfere with the public's right to record, or who delete or destroy these recordings, to a dismissal category offense; and (C) train officers every two years regarding these new changes to the SOP. (Consent Order Attached hereto as Exhibit C)

63.     The court-ordered language prohibiting officers from deleting or destroying recordings was never added to the Atlanta Police Department SOP, and the required training regarding these collective

revisions was not timely entered and conducted and neither the policy

nor training were in place at the time of this incident despite existing

court orders

64.     The Order required the City of Atlanta to "permanently …

implement" specific revisions to the APD SOP and "to conduct

mandatory in-person training of all Atlanta police officers every two

years regarding these SOP revisions."

65.     More than two years later (including the time of the incident in this

lawsuit), in deliberate indifference to both the existing Consent Order

and to the obvious need for the policy and training outlined, the City

still had not complied with the straightforward obligations imposed

upon it by the Order.

66.     At the time of Ruch's arrest, the language of Section 4.4.1 of

APD.SOP.2011 was identical to what it was when the Court ordered

that it be revised.  In addition, the City still had not conducted the

training that it was ordered to conduct "regarding [the SOP]

revisions."

67.     The City's failures resulted in actual harm, beyond Ruch's arrest.  In

19

November 2014, several reporters covering the Ferguson demonstrations in downtown Atlanta had their cameras taken away from them by APD officers as these individuals attempted to film police activity. One of them was Tyson Paul, a photojournalist for 11Alive News, whose arrest by police officers during his coverage of the protests has been the subject of numerous news stories.

68.     The City of Atlanta was held in contempt of court for its repeated failure to adopt policies and trainings required by existing Court orders dealing specifically with not interfering with citizens' photographing or filming of police activities. (Contempt Order attached hereto as Exhibit D).

69.     The City of Atlanta's deliberate indifference to the need for policies and training, made patently clear by the Consent Order it entered into and then violated for years, was a moving force for the constitutional violations suffered by Ruch. Moreover, a custom was created of repeatedly interfering and often arresting citizens who are legally photographing or filming police activity.

70.     Further, in *Calhoun v. City of Atlanta*, No. 1:09-CV-3286-TCB (N.D.

Case 1:15-cv-03296-MHC Document 1-2 Filed 09/21/15 Page 21 of 28

Ga. 2011), the City of Atlanta entered into a Consent Order whereby the City agreed to permanently revoke or amend all APD SOPs regarding warrantless searches, arrests, and investigatory detentions and frisks without reasonable articulable suspicion. As part of that order, the City agreed to "prohibit Atlanta police officers from interfering in any way with a citizen's right to make video, audio, or photographic recordings of police activity, as long as such recording does not physically interfere with the performance of an officer's duty." (Consent Order Attached hereto as Exhibit E).

71. The *Calhoun* Order required that the City of Atlanta conduct mandatory, in-person trainings by non-APD trainers for all sworn APD employees. This included training about officers being prohibited from interfering with citizens' right to record police activity. The Order required that the City of Atlanta provide recurring training on this issue to every sworn APD officer every two years.

72. Despite these orders, APD did not add the court-ordered language prohibiting officers from deleting or destroying recordings to its SOP and failed to conduct the first of the court-ordered training regarding

the change in SOP until June 2015.

73.     Well over two years later (and at the time of the incident in this
lawsuit), in deliberate indifference to **both** consent orders and to the
obvious need for the policy and training outlined, the City still had not
complied with the straightforward obligations imposed upon it by the
orders.

74.     At the time of Ruch's arrest, the language of Section 4.4.1 of
APD.SOP.2011 was identical to what it was when the Court ordered
that it be revised.  In addition, the City still had not conducted the
trainings that it was ordered to conduct in either the *Anderson* Order
or the *Calhoun* Order.

75.     In Calhoun as well, the City of Atlanta was held in contempt of court
for its repeated failure to adopt policies and trainings required by
existing Court orders dealing specifically with not interfering with
citizens' photographing or filming of police activities.  (Contempt
Order attached hereto as Exhibit F).

76.     The City of Atlanta's deliberate indifference to the need for policies
and training, made patently clear by the consent orders it entered into

22

and then violated for years, was a moving force for the constitutional violations suffered by Ruch. Moreover, the City's on-going refusal to comply with the consent orders created a *de facto* custom of APD officers repeatedly interfering with—and often arresting—citizens who are legally photographing or filming police activity.

77.     Ruch timely file complaints with both that Atlanta Police Department's Office of Professional Standards (OPS) and Citizen Review Board. In violation of the *Calhoun* consent order, the OPS Complaint was not timely resolved and remains outstanding. The Citizen Review Board recommended discipline for the false arrest of Ruch, but no action has been take on that recommendation by Defendant City of Atlanta.

78.     Ruch timely filed a ante-litem notice and demand, but received no response. (Demand Attached hereto as Exhibit G)

## **Count I: Fourth Amendment**

79.     This Count is alleged against each officer, in their individual capacities, and the City of Atlanta, under 42 U.S.C. § 1983 and the Fourth Amendment of the United States Constitution for unlawful

seizure, false arrest and malicious prosecution.

80.     The facts within the Officers' knowledge were not sufficient to
        establish probable cause that Plaintiff committed the crime of
        disorderly conduct or any other criminal offense.

81.     Based upon the facts known by the Officers, no reasonable police
        officer could believe that even arguable probable cause existed to
        arrest Plaintiff, and there was no arguable probable cause for his
        arrest.

82.     The Officers each acted with conscious indifference and reckless
        disregard for the consequences of their actions such that an award of
        punitive damages is authorized under federal law.

83.     The actions of the officers were caused in part by the policy and
        practice of the City of Atlanta whose (1) delegated final policymakers
        orders as well as (2) failure to adopt Court ordered policies and
        trainings was a moving force for the harms caused.

### Count II: First Amendment

84.     This Count is alleged against the officers and the City of Atlanta
        under 42 U.S.C. § 1983 and the First Amendment of the United States

24

Constitution.

85.     Ruch was engaged in clearly constitutionally protected free speech

activity when he sought to film police activity in a non-disruptive way

from a public sidewalk.

86.     The seizure, arrest and interference with filming violated Ruch's First

Amendment rights.

87.     The actions of the officers were caused in part by the policy and

practice of the City of Atlanta whose (1) delegated final policymakers

orders as well as (2) failure to adopt Court ordered policies was a

moving force for the harms caused.

## Count III: Violation of Federal Law

88.     This count is alleged against all defendants for violations of 42 U.S.C.

§ 2000aa.

89.     Defendants searched and seized work product (namely, a camera

containing video documentation of a public event) possessed by a

member of the press that they were informed was intended for public

communication without securing a warrant and without probable

cause or good faith to believe that the video related to the commission of any criminal offense.

90.     Defendants are liable under 42 U.S.C. § 2000aa-6 for Ruch's actual damages and liquidated damages of not less than $1,000 plus attorneys' fees and costs.

## Count IV: State Law Claims

91.     This Count is alleged against the officers in their individual capacities and the City of Atlanta.

92.     By placing Plaintiff under arrest and instituting prosecution, Defendants subjected Plaintiff to an unlawful detention in violation of OCGA § 51-2-70, and committed an assault and battery against Plaintiff in violation of OCGA §§ 51-1-13 and 51-1-14 and malicious prosecution under O.C.G.A. § 51-7-44.

93.     As the facts alleged indicate, the officers acted with actual malice toward Plaintiff. In making the decision to arrest Plaintiff, the officers each possessed the deliberate intent to do wrong.

94.     The officers' actions were malicious, reckless, and callously indifferent to Plaintiff's clearly established rights, and they are not

entitled to official immunity under Georgia law.

95.     The City of Atlanta is liable for the intentional and negligent actions of the officers under the doctrine of respondeat superior for violations of State law.

*Prayer for Relief*

WHEREFORE, Plaintiff requests this Court:

a.      Hold a trial by jury on all issues so triable;

b.      Award nominal, compensatory and punitive damages against the officers in their individual capacities and the City of Atlanta in an amount to be proven at trial;

c.      Award compensatory damages against the City of Atlanta under the doctrine of respondeat superior for state law claims in an amount to be proven at trial;

d.      Award Plaintiff attorney's fees under 42 U.S.C. § 1988 and as authorized under Georgia law;

e.      Grant such other and further relief as this Court deems just and proper.

Respectfully submitted, this 21st day of September, 2015.

/s/ Gerald Weber
Georgia Bar No. 744878

27

Law Offices of Gerry Weber, LLC
Post Office Box 5391
Atlanta, GA 31107
(404) 522-0507

/s/ Daniel J. Grossman
Georgia Bar No. 313815
Law Office of Daniel J. Grossman
1579 Monroe Drive, Ste. F-138
Atlanta, GA 30324
(404) 654-0326

/s/ Hollie Manheimer
Hollie Manheimer
Georgia Bar No. 468880
150 East Ponce de Leon Ave
Suite 230
Decatur, Georgia 30030
(404) 377-0485

Attorneys for Plaintiff-Ruch

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

JOHN RUCH,                          )
                                    )
    Plaintiff,                      )
                                    )         CASE NO:
    v.                              )         1:15-CV-03296-MHC
                                    )
CITY OF ATLANTA,                    )
SERGEANT MICHELLE MCKENZIE,         )
SERGEANT ALAN GRUEN,                )
OFFICER BROWN, and                  )
DEPUTY CHIEF RODNEY BRYANT,         )
DEPUTY CHIEF JOSEPH SPILLANE,       )
MAJOR JAMES WHITMIRE,               )
each individually,                  )
                                    )
    Defendants.                     )

## [PROPOSED] AMENDED COMPLAINT

COMES NOW Plaintiff John Ruch and brings this action against Defendants

for violations of the First, Fourth and Fourteenth Amendments of the United States

Constitution, 41 U.S.C. § 2000aa and Georgia law after he was arrested while

working as a reporter photographing police activity in a non-disruptive way from a

distance on a public sidewalk.

1

Case 1:15-cv-03299-MHC Document 1-2 Filed 08/18/16 Page 30 of 32

## PARTIES

1.     Plaintiff John Ruch ("Plaintiff") is a United States citizen and resident of Georgia and over the age of eighteen.  He is currently Associate Editor at Spring Publishing in Sandy Springs, Georgia.  At the time of this incident, Ruch served as a reporter for *Creative Loafing*, an Atlanta-based newspaper.

2.     Defendants Sergeant Michelle McKenzie  ("McKenzie"), Sergeant Alan Gruen ("Gruen"), Officer Brown (identity to be determined and Complaint amended), Major James Whitmire  (collectively "Officers") are all employed as police officers by the City of Atlanta. They are sued in their individual capacities.  At all times relevant to the complaint, each acted under the color of law.

3.     Defendant City of Atlanta is a municipal corporation created under the laws of the State of Georgia. At all times relevant to this complaint, the City of Atlanta employed the Officers as police officers with the Atlanta Police Department ("APD").

## JURISDICTION AND VENUE

4.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331

2

because this case presents a federal question under 42 U.S.C. § 1983 and the First, Fourth and Fourteenth Amendments of the United States Constitution.

5.      This Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367.

6.      Upon service of process, this Court acquires personal jurisdiction of the Defendants under Fed.R.Civ.P. 4(k)(1)(a).

7.      Venue is proper in the Northern District of Georgia under 28 U.S.C. § 1391(b) because all actions complained of occurred within the boundaries of this district and Defendants reside within this district.

## STATEMENT OF FACTS

8.      John Ruch is a frequently published freelance journalist.

9.      On November 25, 2014, around 8 p.m., he went to downtown Atlanta to investigate a potential news story: the Ferguson protest taking place in downtown Atlanta was turning into a large march, making it a significant part of an historic national event.

10.     The police claim that every other person in the crowd had a cellphone, and that everyone had been filming and taking pictures all night.

11.     Ruch was assigned by *Creative Loafing* News Editor Thomas Wheatley to cover the protest along with his on-scene reporter, Max Blau.  Wheatley assigned Ruch to cover the tail-end of the march, while he took the front end and Max Blau covered the middle of the group.

12.     Ruch's work would involve tweeting on *Creative Loafing*'s live blog and contributing whatever stories or photographs he had for future stories in the *Creative Loafing*.

13.     Around 11:45 p.m., the march turned onto Spring Street and began to coalesce around a specific group of protesters. Ruch heard a commotion involving civilians and officers in front of the America's Mart entrance and Zone 5 police station area, near the Andrew Young Boulevard intersection.

14.     Recognizing that a newsworthy matter was transpiring, Ruch approached the scene to photograph and report on whatever was occurring.

15.     When he reached the main body of protesters on the Spring Street sidewalk, they had formed a kind of circle around something and were

chanting. Through gaps in the human wall, he could see police wrestling one or two people to the ground and arresting them.

16. From his vantage point on the sidewalk some distance away, Ruch had a clear view of police officers wrestling a person to the ground and arresting them. The people being arrested were screaming and the police officers were very forcefully slamming them to the ground. While Ruch did not know the reason for the arrest, he knew it would be a powerful image in any case and had an outstanding view. The sidewalk is quite wide there, and Ruch was about six feet away from the arrest and remained there on the sidewalk.

17. Ruch lifted his phone to take a news photo, keeping distance and placement on the sidewalk while attempting to frame the shot. His head was down and focused on his camera phone, which he held around stomach height to photograph the action on the ground.

18. Without warning of any kind, someone waved a hand in front of his camera purposefully disrupting him. This person did not say anything, and only attempted to block Ruch's shot.

19. At no time during the entire incident that led to his arrest did Ruch

5

interfere with any arrests or any other police activity in any way and he was not given and did not disobey any instructions from any officers.   On information and belief, other reporters were in the precise area where Ruch was arrested and they too received no instructions from police directed at the media or the protesters generally.

20.     Remaining on the sidewalk and away from the arrest, Ruch shifted his body slightly in order to get the shot while the gap between other people was still clear. The hand-waving person then leaped in front of Ruch.

21.     The person then grabbed Ruch's camera and his wrist or forearm, preventing him from taking the shot.

22.     Ruch then looked at the person fully and saw she was a police officer, who he later came to learn is named Defendant Sergeant Michelle McKenzie.   Officer McKenzie continued to say nothing as she grabbed Ruch. She then pushed Ruch, forcing him to take a step back.

23.     Ruch immediately said, "Hey, I'm a reporter! I'm with the media! I'm with the media!" Officer McKenzie still said nothing but paused for a

6

half-second. Ruch then felt someone grab and tug on his jacket from behind.

24.     Defendant Major James Whitmire, a supervising officer of Officer McKenzie verbally ordered Ruch's arrest but claims he does not remember whether Ruch had a phone of any kind. Mr. Ruch was arrested by Sergeant McKenzie and asked him to put his phone away. Whitmire said to McKenzie, "Take this one." Officer McKenzie immediately ordered, "You're under arrest. Get on the ground." Another officer (later identified as Defendant Officer Brown) joined her in forcing Ruch face down on the sidewalk. Ruch complied peacefully. They both ordered Ruch to place his hands behind his head.

25.     As he lay on the ground, Ruch repeatedly said he was a reporter for *Creative Loafing* and repeatedly asked why he was being arrested and what he was being charged with. The officers said nothing and did not read him his rights.

26.     Without any arguable probable cause, the officers handcuffed Ruch and brought him to his feet. Another officer appeared and replaced

7

handcuffs with plastic tie cuffs. The officers confiscated Ruch's cell phone and hat.

27.     As this was happening, Editor Wheatley walked nearby. Ruch shouted to him, "Thomas, they're arresting me!" Wheatley approached, identified himself as the *Creative Loafing* News Editor, and informed the officers that he was a journalist working for *Creative Loafing*.

28.     The officers asked if Ruch had a "media badge." Wheatley explained to the officers that Ruch was not issued a media badge and noted that he himself did not have any such badge. The officers said nothing, merely standing there holding Ruch's arms. Thomas Wheatley and Ruch repeatedly asked the officers why they were arresting Ruch and under what charges. The officers remained silent.

29.     After a couple of minutes, Ruch was handed off to another officer and made to stand in the street behind a police car.

30.     Wheatley continued to ask about the charges, again meeting only silence from the officers.

31.     After some time, two or three officers escorted Ruch up the sidewalk on Andrew Young Boulevard, where a police car and a prisoner

8

transport bus were parked.

32.     As they walked toward the transport bus, Wheatley pointed Ruch out
to Greg Bluestein, a reporter with the *Atlanta Journal-Constitution*.
Ruch quickly told Bluestein his name and that he was being arrested
for taking a news photo.

33.     As they walked up Andrew Young Boulevard, Wheatley followed
alongside, repeatedly asking the officers what Ruch was charged with.
One of them, (later identified as a "Lt. K. Tiernan"), repeatedly said,
"We can't tell you. That would violate his privacy." Ruch stated he
waived any privacy rights and that Ruch too did not know the charge.
Lt. Tiernan did not say what the charges were. The other officers
remained silent. Thomas Wheatley and Ruch also asked where Ruch
was being taken, and the officers either refused to explain or admitted
that they did not know.

34.     The police made Ruch stand in a group with the other arrestees, away
from reporters.

35.     After some minutes, the officers made any witnesses leave that part of
the sidewalk. One citizen holding some type of camera approached,

9

and an officer remarked to another that he had been told to stay away and that he would be arrested if he approached closer and filmed.

36.    Eventually, an officer named Defendant Sergeant Alan Gruen approached Ruch and engaged him in a private conversation. Gruen had Ruch wait a moment while he spoke with Major Whitmire who informed Gruen of the alleged basis for arrest. .

37.    Officer Gruen then returned. Ruch had been wearing a cowboy-style hat that was removed during his arrest. Officer Gruen, in a deliberate manner, placed it back on Ruch's head backward. Gruen or another officer also returned Ruch's phone, placing it in his shirt pocket, where Ruch could not access it while handcuffed.

38.    Officer Gruen asked if Ruch held a Georgia driver's license, and Ruch said yes. Gruen then asked, "Do you have a City of Atlanta license?" Officer Gruen attempted to intimidate Ruch, standing very close, face to face, and said something approximating, "Look, you must have done something to get arrested." Ruch replied, "I did not commit any crime," explained that he was a reporter who had been trying to take a news photo.

39.     Gruen became visibly angry and began speaking over Ruch. Gruen then said, "There must have been something that gave us probable cause. We can't un-arrest you, because that makes liability." Ruch repeated that he had not committed any crime.  Nevertheless, Gruen later charged Ruch, based on an order from an unidentified lieutenant.

40.     The police continued to leave Ruch standing in the street. They discussed various options for what to do with Ruch and the other protesters, ranging from jail transport to giving the group "tickets" (official city complaint notices) and releasing them.

41.     The officers also could not locate Ruch's "arresting officer," Officer McKenzie, repeatedly asking each other where she was and trying to contact her on the radio.

42.     Eventually, yet another officer, a white male, approached Ruch with a ticket form asking for his name, address and birthdate. Ruch asked him why he was filling out this form, what he was being charged with, and whether he would just be given a ticket or released. He said, "I don't know."

43.     After more waiting, police officers ordered the group to get in the

11

prisoner transport bus. They were not told where they were being taken despite queries from group members.

44. The prisoner transport bus drove only a half-block, just across Spring Street, and stopped in front of the Zone 5 police station. After a lengthy wait, officers took the group inside the police station, into a large room mostly occupied by police bicycle racks. Approximately 16 other arrestees were seated on plastic chairs. Twenty or more police officers were in various locations around the room. The group of arrestes remained in the room, seated and handcuffed, for at least three hours. At no point did any officer read arrestees their rights,  or offer them food, water or phone calls -- nor were arrestees informed of any charges against them.

45. During this long wait, there was frequent conversation among and between the arrestees and the police officers. It became clear that most arrestees were not informed of the charges against them. Several arrestees indicated officers had grabbed from behind for no reason. It also became clear that the officers had no idea why most of the arrestees were there or what to do with them. Some of the more

friendly officers openly admitted, "We don't know" when asked what facility they would end up in, or why they were being imprisoned in the bike room of a police station.

46. The accounts from other arrestees strongly suggested that the police were using arrests to deter others from protesting. The police used these bogus arrests to make a spectacle of the protesters they labeled "trouble-makers" and to hold them as long as possible. Like Ruch, several other arrestees said they had been grabbed from behind and arrested for no apparent reason, even while walking away from the scene. Several police officers stated that the police department had decided to end the protest, and none of them could explain what they were doing there.

47. The officers searched each arrestee -- placing property into a bag (without a receipt), and then photographing each person.

48. Ruch's confiscated property included his cell phone and reporter's notebook, which he specifically requested that officers close and not examine for First Amendment reasons.

49. The officers wanted to photograph each arrestee with their arresting

13

officer, but Sergeant McKenzie, still could not be found. During this process, Ruch got a first glimpse at the ticket he would be issued—he could see it had been fully filled out even though the arresting officer was not present. Ruch does not know who actually filled out the citation, though the handwriting appears similar to that of the white male officer who originally entered his name and address on the form. A civilian photographer took a photo of while an officer held some kind of note on a piece of paper under his chin. Ruch asked them, "What is this for? Is this a booking photo?" Both officers said, "I don't know." Ruch asked the photographer if she was a police officer and she said she is not.

50. After several hours, Sergeant Gruen told Ruch to join him for another private chat. At this point, Gruen finally informed Ruch of the charge: disorderly conduct-obstruction. Ruch asked if that was two charges or one, and Gruen clarified it was only one. Officer Gruen then said, "It's a bullshit charge, but my lieutenant said we have to charge you. If it was up to me, I'd cut you loose." Officer Gruen then added, "I'm an open-minded guy. I probably shouldn't even be a police officer." Ruch

asked what would happen to him, and Gruen said that Ruch would be taken to the city jail and allowed to leave on a "signature bond."

51.     At approximately 3:30 a.m., four of the arrestees were released without charge. One of them was a black man wearing a Public Enemy T-shirt with the left back shoulder area ripped as if from being grabbed. Another arrestee may have been released after police officers belatedly realized they had not processed him and none of them knew his name, the charges against him or even the arresting officer. Many of the other arrestees did not know the charges against them, and their arresting officers were not at the police station. One woman later said her ticket did not even identify any charges, complicating her booking.

52.     The remaining arrestees were taken back to the bus, where they waited for a long time. By this time, Ruch's wrists were aching and his right shoulder and upper arm cramped from having been cuffed for so long.

53.     Finally, the bus drove to the city jail. Upon arrival, correction officers informed arrestees that their bonds were posted by anonymous "good

15

Samaritans" (later identified as the "Georgia Civil Disobedience Defense Fund"), and that they would be released after being booked. Arrestees were finally released from their handcuffs and seated en masse in the intake room lobby area. For the first time, Ruch and others had access to a water fountain and some food.

54.     The booking process took about two hours, including mug shot photos and fingerprinting. Ruch's booking was further delayed when he pointed out that they had mispelled his last name on the release form, and this error led to a second warrant check.

55.     Officers eventually release Ruch into the lobby area, where he met Wheatley and several members of the group that had bailed him out. They escorted Ruch to a nearby bail bond office to fill out final release paperwork.

56.     At the request of the city solicitor, Ruch's charges were dismissed at a 1 p.m. court hearing the next day.  (The ticket and disposition are attached hereto as Exhibits A and B).

57.     Ruch's wrists remained red from the cuffs for about 24 hours. The soreness in his arm persisted through November 27, 2014 and his

shoulder continued to make popping noises until around December 2, 2014.

58.     As a result of Plaintiff's arrest, he suffered a loss of his liberty, reputational damage, humiliation, and physical and emotional distress.

## City of Atlanta's Policy and Practice and Contempt of Court in Failing to Adopt Court Required Policies and Training

59.     The City of Atlanta, as a matter of policy and practice, has routinely and customarily interfered with and often arrested citizens solely for constitutionally protected filming or photographing of police activity.

60.     On information and belief, and according to Defendant City of Atlanta's own employees, specifically delegated final policymakers for the City (Defendants Rodney Bryant and Joseph Spillane) gave instructions to officers on the date in question to arrest persons in the protest area who were filming protest activities and a specific instruction was given by a supervising officer, Defendant John Doe 1, to arrest Ruch.

61.     At least three prior legal matters have been settled by the City of Atlanta involving  officers who interfered with and arrested citizens solely  for  constitutionally  protected  filming  or  photographing  of

police activity.  Several other instances, not leading to litigation, have
occurred where officers interfered with and arrested citizens solely for
constitutionally protected filming or photographing of police activity.

62.  In *Anderson v. City of Atlanta,* No. 11-CV-3398-SCJ (N.D. Ga. 2011),
Plaintiff, Felicia Anderson, brought this case against the City of
Atlanta and one of its police officers alleging, among other things, that
she was falsely arrested for photographing police activity that
occurred in public and that this arrest was conducted pursuant to an
unlawful policy and practice of the Atlanta Police Department
("APD").

63.  The parties ultimately reached a settlement on Ms. Anderson's claims
that included a Consent Order requiring the City to: (A) add specific
language to the Atlanta Police Department's Standard Operating
Procedure ("SOP") prohibiting officers from deleting or destroying
recordings of police activity; (B) upgrade the penalty for officers who
interfere with the public's right to record, or who delete or destroy
these recordings, to a dismissal category offense; and (C) train officers
every two years regarding these new changes to the SOP. (Consent

18

Order Attached hereto as Exhibit C)

64.     The court-ordered language prohibiting officers from deleting or destroying recordings was never added to the Atlanta Police Department SOP, and the required training regarding these collective revisions was not timely entered and conducted and neither the policy nor training were in place at the time of this incident despite existing court orders

65.     The Order required the City of Atlanta to "permanently … implement" specific revisions to the APD SOP and "to conduct mandatory in-person training of all Atlanta police officers every two years regarding these SOP revisions."

66.     More than two years later (including the time of the incident in this lawsuit), in deliberate indifference to both the existing Consent Order and to the obvious need for the policy and training outlined, the City still had not complied with the straightforward obligations imposed upon it by the Order.

67.     At the time of Ruch's arrest, the language of Section 4.4.1 of APD.SOP.2011 was identical to what it was when the Court ordered

19

that it be revised.  In addition, the City still had not conducted the training that it was ordered to conduct "regarding [the SOP] revisions."

68.     The City's failures resulted in actual harm, beyond Ruch's arrest.  In November 2014, several reporters covering the Ferguson demonstrations in downtown Atlanta had their cameras taken away from them by APD officers as these individuals attempted to film police activity.  One of them was Tyson Paul, a photojournalist for 11Alive News, whose arrest by police officers during his coverage of the protests has been the subject of numerous news stories.

69.     The City of Atlanta was held in contempt of court for its repeated failure to adopt policies and trainings required by existing Court orders dealing specifically with not interfering with citizens' photographing or filming of police activities.  (Contempt Order attached hereto as Exhibit D).

70.     The City of Atlanta's deliberate indifference to the need for policies and training, made patently clear by the Consent Order it entered into and then violated for years, was a moving force for the constitutional

violations suffered by Ruch.  Moreover, a custom was created of repeatedly interfering and often arresting citizens who are legally photographing or filming police activity.

71.     Further, in *Calhoun v. City of Atlanta*, No. 1:09-CV-3286-TCB (N.D. Ga. 2011), the City of Atlanta entered into a Consent Order whereby the City agreed to permanently revoke or amend all APD SOPs regarding warrantless searches, arrests, and investigatory detentions and frisks without reasonable articulable suspicion.  As part of that order, the City agreed to "prohibit Atlanta police officers from interfering in any way with a citizen's right to make video, audio, or photographic recordings of police activity, as long as such recording does not physically interfere with the performance of an officer's duty."  (Consent Order Attached hereto as Exhibit E).

72.     The *Calhoun* Order required that the City of Atlanta conduct mandatory, in-person trainings by non-APD trainers for all sworn APD employees.  This included training about officers being prohibited from interfering with citizens' right to record police activity.  The Order required that the City of Atlanta provide recurring

21

training on this issue to every sworn APD officer every two years.

73. Despite these orders, APD did not add the court-ordered language prohibiting officers from deleting or destroying recordings to its SOP and failed to conduct the first of the court-ordered training regarding the change in SOP until June 2015.

74. Well over two years later (and at the time of the incident in this lawsuit), in deliberate indifference to **both** consent orders and to the obvious need for the policy and training outlined, the City still had not complied with the straightforward obligations imposed upon it by the orders.

75. At the time of Ruch's arrest, the language of Section 4.4.1 of APD.SOP.2011 was identical to what it was when the Court ordered that it be revised. In addition, the City still had not conducted the trainings that it was ordered to conduct in either the *Anderson* Order or the *Calhoun* Order.

76. In Calhoun as well, the City of Atlanta was held in contempt of court for its repeated failure to adopt policies and trainings required by existing Court orders dealing specifically with not interfering with

citizens' photographing or filming of police activities. (Contempt Order attached hereto as Exhibit F).

77. The City of Atlanta's deliberate indifference to the need for policies and training, made patently clear by the consent orders it entered into and then violated for years, was a moving force for the constitutional violations suffered by Ruch. Moreover, the City's on-going refusal to comply with the consent orders created a *de facto* custom of APD officers repeatedly interfering with—and often arresting—citizens who are legally photographing or filming police activity.

78. Ruch timely file complaints with both that Atlanta Police Department's Office of Professional Standards (OPS) and Citizen Review Board. In violation of the *Calhoun* consent order, the OPS Complaint was not timely resolved and remains outstanding. The Citizen Review Board recommended discipline for the false arrest of Ruch, but no action has been take on that recommendation by Defendant City of Atlanta.

79. Ruch timely filed a ante-litem notice and demand, but received no response. (Demand Attached hereto as Exhibit G)

23

80.     The City of Atlanta's custom and practice of unlawfully interfering with the right of the public to video and photograph police activity was so pervasive that the City agreed to a Consent Order in 2010 requiring the City to amend the Atlanta Police Department's Standard Operating Procedures to prohibit officers from interfering with a citizen's right to photograph police activity in the future, and to train officers every two years regarding the public's right to photograph police activity. December 8, 2010 Order in *Calhoun v. City of Atlanta*, No. 1:09-CV-3286-TCB attached hereto as Exhibit H.

81.     Two years later, the problem of unlawful interference with photography by Atlanta police officers was still such a significant problem that the City agreed to another Consent Order, in a separate case, that not only again required the City to prohibit officers from interfering with a citizen's right to photograph police activity, but also required the City to upgrade the penalty to a dismissal category offense, and to train officers every two years regarding both the public's right to photograph and the upgraded penalty for interfering with this right. March 22, 2012 Order in *Anderson v. City of Atlanta,*

24

No. 11-CV-3398-SCJ attached hereto as Exhibit C.

82.     Arrests for Disorderly Conduct are among the most common types of arrest made by Atlanta police officers, who make hundreds of these arrests per year. See Atlanta Police Uniform Crime Reports (available at http://www.atlantapd.org/uniformcrimereports.aspx) and Atlanta Police Crime Data Downloads (available at http://www.atlantapd.org/crimedatadownloads.aspx).

83.     The City of Atlanta has been made aware of numerous instances of unlawful arrests without probable cause made by Atlanta police officers for Disorderly Conduct and Obstruction over the past years that have resulted in civilian complaints to the Atlanta Police Department, complaints to the Atlanta Citizen Review Board, and lawsuits against Atlanta police officers and the City of Atlanta itself. As just a few examples, these include:

1.  The sustained ACRB complaint and lawsuit (for which the City of Atlanta paid $20,000) of Minnie Carey, who was arrested for Disorderly Conduct on March 26. 2009;

2.  The sustained ACRB complaint and civil claim (for which the City of Atlanta paid $90,000) of Shequita Walker, who was arrested for Disorderly Conduct on April 21, 2011 by Officer Kenneth Thomas (who had made 27 arrests for Disorderly Conduct between January 1, 2011 and

June 10, 2011, according to the findings of the ACRB);

3. The OPS complaint and civil claim of Carolyn Carr, who alleges she was arrested for Disorderly Conduct without probable cause on October 6, 2013 (OPS File 14-I-0260-UAF)

4. The sustained OPS complaint and civil claim of Steven Simon, who was unlawfully arrested without probable cause (according to the finding of the Atlanta Police Department) for Disorderly Conduct on October 13, 2011 (OPS File 12-I-0229-UAF)

5. The lawsuit of Chastity Jones, who was arrested for Disorderly Conduct without probable cause March 15, 2007 (see Jones v. Warner, 686 S.E.2d 835, 301 Ga. App. 39 (Ga. App., 2009))

84.     Plaintiff's counsel have reviewed hundreds of pages of Atlanta Police Department training materials from the past several years (including lesson plans, PowerPoint presentations, and other items) and have not found any training materials informing Atlanta Police Officers of the elements of the offense of Disorderly Conduct, or what facts are required to make a lawful arrest for that offense.

85.     Pursuant to a request made under the Georgia Open Records on September 15, 2015 for "all Atlanta Police Department training materials and related records for the past five years regarding police response to public protests and demonstrations, and police response to

First Amendment issues and situations," the City of Atlanta produced lesson plans, PowerPoint presentations, handouts, and similar training materials; none of the materials dated prior to Plaintiff's arrest include any training about the elements of the offense of Disorderly Conduct, or what facts are required to make a lawful arrest for that offense, even though this issue arises frequently in the context of protests such as the one at which Plaintiff was arrested.

## Count I: Fourth Amendment

86.  This Count is alleged against each officer, in their individual capacities, and the City of Atlanta, under 42 U.S.C. § 1983 and the Fourth Amendment of the United States Constitution for unlawful seizure, false arrest and malicious prosecution.

87.  The facts within the Officers' knowledge were not sufficient to establish probable cause that Plaintiff committed the crime of disorderly conduct or any other criminal offense.

88.  Based upon the facts known by the Officers, no reasonable police officer could believe that even arguable probable cause existed to arrest Plaintiff, and there was no arguable probable cause for his

27

arrest.

89.     The Officers each acted with conscious indifference and reckless disregard for the consequences of their actions such that an award of punitive damages is authorized under federal law.

90.     The actions of the officers were caused in part by the policy and practice of the City of Atlanta whose (1) delegated final policymakers orders as well as (2) failure to adopt Court ordered policies and trainings was a moving force for the harms caused.

## Count II: First Amendment

91.     This Count is alleged against the officers and the City of Atlanta under 42 U.S.C. § 1983 and the First Amendment of the United States Constitution.

92.     Ruch was engaged in clearly constitutionally protected free speech activity when he sought to film police activity in a non-disruptive way from a public sidewalk.

93.     The seizure, arrest and interference with filming violated Ruch's First Amendment rights.

94.     The actions of the officers were caused in part by the policy and

28

practice of the City of Atlanta whose (1) delegated final policymakers orders as well as (2) failure to adopt Court ordered policies was a moving force for the harms caused.

## Count III: Violation of Federal Law

95.    This count is alleged against all defendants for violations of 42 U.S.C. § 2000aa.

96.    Defendants searched and seized work product (namely, a camera containing video documentation of a public event) possessed by a member of the press that they were informed was intended for public communication without securing a warrant and without probable cause or good faith to believe that the video related to the commission of any criminal offense.

97.    Defendants are liable under 42 U.S.C. § 2000aa-6 for Ruch's actual damages and liquidated damages of not less than $1,000 plus attorneys' fees and costs.

## Count IV: State Law Claims

98.    This Count is alleged against the officers in their individual capacities and the City of Atlanta.

99.     By placing Plaintiff under arrest and instituting prosecution, Defendants subjected Plaintiff to an unlawful detention in violation of OCGA § 51-2-70, and committed an assault and battery against Plaintiff in violation of OCGA §§ 51-1-13 and 51-1-14 and malicious prosecution under O.C.G.A. § 51-7-44.

100.    As the facts alleged indicate, the officers acted with actual malice toward Plaintiff. In making the decision to arrest Plaintiff, the officers each possessed the deliberate intent to do wrong.

101.    The officers' actions were malicious, reckless, and callously indifferent to Plaintiff's clearly established rights, and they are not entitled to official immunity under Georgia law.

102.    The City of Atlanta is liable for the intentional and negligent actions of the officers under the doctrine of respondeat superior for violations of State law.

103.    At all times relevant to the subject incident, Defendant officers were working for the Defendant City in furtherance of the City's business.

*Prayer for Relief*

WHEREFORE, Plaintiff requests this Court:

30

a.      Hold a trial by jury on all issues so triable;

b.      Award nominal, compensatory and punitive damages against the
        officers in their individual capacities and the City of Atlanta in an
        amount to be proven at trial;

c.      Award compensatory damages against the City of Atlanta under the
        doctrine of respondeat superior for state law claims in an amount to be
        proven at trial;

d.      Award Plaintiff attorney's fees under 42 U.S.C. § 1988 and as
        authorized under Georgia law;

e.      Grant such other and further relief as this Court deems just and proper.

    Respectfully submitted, this 11th day of February, 2016.

                                    /s/ Gerald Weber
                                    Georgia Bar No. 744878
                                    Law Offices of Gerry Weber, LLC
                                    Post Office Box 5391
                                    Atlanta, GA 31107
                                    (404) 522-0507

                                    /s/ Daniel J. Grossman
                                    Georgia Bar No. 313815
                                    Law Office of Daniel J. Grossman
                                    1579 Monroe Drive, Ste. F-138
                                    Atlanta, GA 30324
                                    (404) 654-0326

31

/s/ Hollie Manheimer
Hollie Manheimer
Georgia Bar No. 468880
150 East Ponce de Leon Ave
Suite 230
Decatur, Georgia 30030
(404) 377-0485

*Attorneys for Plaintiff-Ruch*